Argued and submitted April 13, affirmed June 20, reconsideration denied August 22, petition for review allowed October 23, 1990 (310 Or 475)

# UNITED STATES NATIONAL BANK OF OREGON,
*Appellant,*

*v.*

## Neal J. BOGE,
*Respondent,*

*and*

## Martin BOGE,
*Defendant - Third-Party Plaintiff,*

*v.*

## J. M. CROWLEY,
*Third-Party Defendant.*

(86-2083; CA A50913)

794 P2d 801

Gregory A. Chaimov, Portland, argued the cause for appellant. With him on the briefs were James F. Dulcich and Miller, Nash, Wiener, Hager & Carlsen, Portland.

Clayton C. Patrick, Salem, argued the cause for respondent. With him on the brief was William D. Brandt, Salem.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

DEITS, J.

## DEITS, J.

U. S. National Bank (Bank) brought this action on promissory notes executed by defendant Neal Boge. Boge counterclaimed, contending, *inter alia,*[1] that Bank breached the implied covenant of good faith and fair dealing in the loan agreement between the parties. The jury awarded damages to Bank on its claim and substantially greater damages to Boge on his counterclaim. The trial court entered a judgment for Boge for the difference between the two amounts and for attorney fees. Bank appeals, and we affirm.

Boge is a dairy farmer in Tillamook County. In 1984, he entered into the loan agreement with Bank, giving it a security interest in his cows. He fell into arrears on his payments, and Bank's Tillamook branch manager, Springer, sent him a 10-day demand letter on May 12, 1986. Boge failed to make full payment within 10 days, and the branch sent the file to its "Special Assets Group" in Portland for foreclosure.

On May 29, Boge and the Rileys, from whom he had purchased the cows, reached a tentative agreement that the Rileys would repurchase the cows and then resell them to Boge. Their objective was to refinance Boge's purchase and pay off his indebtedness to Bank. At the time, Boge had the right under ORS 79.5060 to "redeem the collateral by tendering fulfillment of all obligations secured by" it. In order to carry out the planned transaction, the Rileys required information about the specifics of Boge's indebtedness to and transactions with Bank, to make sure that they could obtain clear title to the cows. Boge, along with the Rileys, met with Springer at the bank and orally requested that he provide Boge with the information. Springer responded that, because the file was in Portland, he could not furnish the information immediately. There was evidence, however, that the information was readily available in computers that were at Springer's disposal. There was also evidence that Springer was aware of the reason for Boge's request, that he was hostile and uncooperative and that, for reasons independent of the immediate events, Bank desired to terminate its lender-borrower relationship with Boge.

---

[1] The other parties and claims are not relevant to this appeal.

Within the next few days, Bank demanded that Boge surrender the cows, along with certain collateralized equipment, by June 5. On June 4, Bank's attorney sent copies of the loan information to Boge's attorney. The next day, Boge complied with Bank's demand and delivered the cows; Bank later sold them at auction in Portland. The use of that location instead of the Tillamook market, and the manner in which the cows were handled, resulted in a substantial loss in market price and in the cows' value.

Bank's failure to provide the information promptly in response to Boge's request, and its foreclosure efforts, caused the contemplated refinancing arrangement between Boge and the Rileys to fail. That prevented Boge from repaying the loan and retaining his property. As a result, he sustained damages in the form of lost profits and the loss of the value of his herd.

■ Bank asserts that the court erred in denying its motion for a directed verdict and in instructing the jury on the implied duty of good faith and fair dealing. Bank contends that it had no such duty, because its responsibility to Boge in this transaction is governed exclusively by applicable provisions of the Uniform Commercial Code. Bank argues that ORS 79.2080(1) and (2)[2] define its duty with respect to debtor

---

[2] ORS 79.2080 provides:

"(1) A debtor may sign a statement indicating what the debtor believes to be the aggregate amount of unpaid indebtedness as of a specified date and may send it to the secured party with a request that the statement be approved or corrected and returned to the debtor. When the security agreement or any other record kept by the secured party identifies the collateral a debtor may similarly request the secured party to approve or correct a list of the collateral.

"(2) The secured party must comply with such a request within two weeks after receipt by sending a written correction or approval. If the secured party claims a security interest in all of a particular type of collateral owned by the debtor the secured party may indicate that fact in a reply and need not approve or correct an itemized list of such collateral. If the secured party without reasonable excuse fails to comply the secured party is liable for any loss caused to the debtor thereby; and if the debtor has properly included in a request a good faith statement of the obligation or a list of the collateral or both the secured party may claim a security interest only as shown in the statement against persons misled by the failure of the secured party to comply. If the secured party no longer has an interest in the obligation or collateral at the time the request is received the secured party must disclose the name and address of any successor in interest known to the secured party and the secured party is liable for any loss caused to the debtor as a result of failure to disclose. A successor in interest is not subject to this section until a request is received by the successor.

"(3) A debtor is entitled to such a statement once every six months without charge. The secured party may require payment of a charge not exceeding $10 for each additional statement furnished."

requests for loan information, that it provided Boge with all requested information within the time that the statute allows and that the statutory remedy is exclusive. Bank also contends that the parties' contract incorporates its rights under ORS 79.2080. Therefore, Bank maintains, both the contract and the statute preclude Boge's assertion, and the trial court erred in allowing the jury to consider his claim based on an implied duty of good faith and fair dealing.

Bank relies on *Sheets v. Knight,* 308 Or 220, 779 P2d 1000 (1989), where the court said:

> "On several occasions we have declared that a 'covenant of good faith and fair dealing' is implied in every contract. *See, e.g, Best v. U.S. National Bank,* 303 Or 557, 561, 739 P2d 554 (1987); *Santilli v. State Farm,* 278 Or 53, 61-62, 562 P2d 965 (1977); *Comini v. Union Oil Co.,* 277 Or 753, 756, 562 P2d 175 (1977); *Perkins v. Standard Oil Co.,* 235 Or 7, 16-17, 383 P2d 1002 (1963). It is more correct to say that the law imposes a duty of good faith and fair dealing in the performance of every contract.[12]

---

> "[12] The Restatement states that 'every contract * * * imposes a duty of good faith and fair dealing' while Williston and our cases declare that 'a covenant' of good faith and fair dealing is 'implied' in every contract. They are referring to the same thing. The duty of good faith and fair dealing is a contractual term implied into contracts as a matter of contract law, *provided the duty is not inconsistent with a term of the contract.*
>
> "When we have spoken of the duty in terms of an implied 'covenant of good faith and fair dealing' we were referring to a duty implied by law. Referring to it as a 'covenant' may lead to confusion." 308 Or at 233. (Emphasis supplied.)

The court went on to conclude that the implied duty of good faith does not apply to the termination of an at-will employment contract, because the "foundation [of such contracts] * * * is the express or implied understanding that either party may terminate the contract for any reason, even for a bad cause." 308 Or at 233.

There is no comparable inconsistency between the contract and the implied duty here. Bank's responsibility to furnish information under ORS 79.2080 contemplates an

ongoing debtor-creditor situation. The purpose of that statute is explained in the Oregon comment:

> "The financing statement required to be filed under ORS 79.4020 may disclose only that a secured party may have a security interest in specified types of collateral owned by the debtor. Unless a copy of the security agreement itself is filed as the financing statement, third parties are told neither the amount of the obligation secured nor which particular assets are covered. Since subsequent creditors and purchasers may legitimately need more detailed information, it is necessary to provide a procedure under which the secured party will be required to make disclosure. On the other hand, the secured party should not be under a duty to disclose details of business operations to any casual inquirer or competitor who asks for them. ORS 79.2080 gives the right to demand disclosure only to the debtor, who will typically request a statement in connection with negotiations with subsequent creditors and purchasers, or for the purpose of establishing his credit standing and proving which of his assets are free of the security interest."

Here, Bank's conduct and the alleged breach of its duty of good faith relate to Bank's responsibilities to Boge in connection with its foreclosure activities and his redemption rights. ORS 79.2080 is not part of the UCC foreclosure or redemption scheme and, therefore, allowing a claim based on an implied duty of good faith in the conduct of those activities is not inconsistent with the contractual requirements or ORS 79.2080.

Boge does not contend that Bank violated its duty of good faith by failing to provide him with information pursuant to ORS 79.2080; his contention is that Bank intentionally withheld available information that it knew he needed immediately in order to exercise his right to preserve collateral on which Bank was actively pursuing foreclosure measures. Bank's emphasis on the fact that it met the requirements of ORS 79.2080 by providing Boge with the information less than two weeks after he requested it misses the point. After Bank received his request, and before it furnished the information, it sent him the demand to surrender the collateral. It required him to make the surrender long before the two week period would expire and one day after it in fact sent him the loan information. ORS 79.2080 does not define the responsibilities of the parties here. Boge was not seeking information

for the purpose envisioned by that statute, but to salvage his collateral and to pay his obligation to Bank; Bank was not exercising its "right" under ORS 79.2080 to take two weeks to respond to a request, but was withholding information for the sake of advancing its own interests at the expense of Boge's statutory and contractual rights. We reject Bank's argument under ORS 79.2080.[3]

■  Bank next argues that the duty of good faith and fair dealing cannot be implied in contracts subject to the UCC, because the UCC contains its own definition of "good faith." ORS 71.2010(19) defines the term to mean "honesty in fact in the conduct or transaction concerned." The honesty in fact standard is a "subjective" one, oriented to the actor's intent or state of mind. *Community Bank v. Ell,* 278 Or 417, 428, 564 P2d 685 (1977). ORS 71.2030 provides:

> "Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance or enforcement."

The trial court's good faith instruction was derived generally from *Restatement (Second) Contracts* § 205 (1979) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement") and, specifically, from *comment d* to that section:

> "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further; bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. * * * [T]he following types [of bad faith] are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, * * * willful rendering of imperfect performance * * * and interference with or failure to cooperate in the other party's performance."

The *Restatement* was endorsed in *Best v. U.S. National Bank,* 303 Or 557, 739 P2d 554 (1987). The implied duty of good faith was also recognized in Oregon cases that predated the promulgation of *Restatement* section 205. *See Comini v. Union Oil Co.,* 277 Or 753, 562 P2d 175 (1977); *Perkins v. Standard Oil Co.,* 235 Or 7, 383 P2d 1002 (1963).

---

[3] Bank argues that Boge did not comply with ORS 79.2080, because his request was not in writing. That point fails along with the others that Bank bases on the statute.

Bank notes that none of those cases involved contracts subject to the UCC and argues that the implied duty of good faith doctrine cannot be applied in the UCC context. According to Bank, the UCC good faith provisions are exclusive, and the *Restatement* formulation, which allows for liability "even though the actor believes his conduct to be justified" and sometimes "require[s] more than honesty," is inconsistent with the subjective "honesty in fact" standard of ORS 71.2010(19).

However, ORS 71.1030 provides:

> "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

Professor Summers wrote in " 'Good Faith' in General Contract Law and the Sales Provisions of the Uniform Commercial Code," 54 Va L Rev 195, 197 n 9 (1968), that that statute is not only the vehicle by which existing law on the general duty of good faith may be imported into the UCC, but, "[a]s the extra-Code law on good faith grows, it can be fed into the Code via [ORS 71.1030]." After section 205 was promulgated, Summers said in his later article, "The General Duty of Good Faith—Its Recognition and Conceptualization," 67 Cornell L Rev 810, 822 (1982), that the *Restatement* principles and the UCC good faith provisions are capable of simultaneous application:

> "Although section 205 of the *Restatement Second* is as it should be, it does not follow that the numerous and varied contexts to which it is addressed cannot, *in addition,* be governed by still other forms of 'good-faith' law." (Emphasis in original; footnote omitted.)

As described in the latter article, 67 Cornell L Rev at 824, and in the comments and reporter's notes to section 205, the UCC provisions were among the "authoritative underpinnings" for the section; however, the *Restatement* formulation was designed to be more flexible than the UCC provisions in its substance and in the circumstances to which it applies. It is noteworthy that the drafters of section 205 contemplated that

it would be applicable to sales transactions to which the UCC also applies. *See* illustration 9.

We conclude that ORS 71.1030 permits the application of the implied duty of good faith doctrine to contracts that are subject to the UCC. The doctrine supplements, but is not inconsistent with the statutory standard.[4] Moreover, the components of the implied duty that are not encompassed by the UCC definition are similar in nature to some of the non-UCC principles—those pertaining to misrepresentation, duress and coercion—that expressly supplement the UCC's provisions under ORS 71.1030. The court did not err by submitting the implied duty of good faith theory to the jury or in instructing the jury on it.

■   Bank also contends that its motion for a directed verdict should have been granted, because Boge did not prove that Bank's breach caused his loss. Bank's theory is that the Rileys' repurchase offer was not for a sufficient sum to pay Boge's debt to Bank in full, *see* ORS 79.5060, and that "Boge presented no evidence that he could make up [the] shortfall." Even assuming the correctness of Bank's premise that Boge was required to prove the success of the performance that Bank's breach prevented him from attempting, it was inferable from Riley's testimony that he would have paid Boge whatever was necessary to exonerate his debt to Bank.

■   In its fifth and sixth assignments, Bank contends that the court erred by submitting to and instructing the jury on loss of value and profits as a measure of damages. It argues that fair market value alone is the appropriate measure, unless "replacement property is unavailable." That is not a correct understanding of the measure of damages. Damages for the lost income that the herd would have generated if Boge had not been deprived of its use, as well as for the loss of its value, are necessary to make him whole. It may be, as Bank argues, that the ability to replace property and the ability to restore its income-producing capabilities will often coincide. However, that relates to mitigation, not to the issues of proof and

---

[4] Whatever differences there may be in the two formulations, it is unlikely that the factfinder, in this or in most cases, would find that the defendant's conduct violated the implied duty but still satisfied the subjective honesty in fact test.

measure of damages with which Bank's fifth and sixth assignments are concerned. We reject the two assignments.

■ ■ Bank's seventh assignment challenges the trial court's denial of its motion for a "directed verdict" with regard to claimed damages for lost value of and profits from unborn cattle. However, the portion of the record quoted in the assignment does not preserve that issue, and we therefore do not address the assignment. In its next assignment, Bank contends that the court erred by allowing Riley to testify concerning settlement negotiations between him and Bank. *See* OEC 408. Our review of the testimony does not bear out Bank's understanding that it had anything to do with a settlement or that there was any claim or potential claim between Bank and Riley to be settled.[5]

■ Bank's final assignment is that the trial court erred in awarding attorney fees to Boge. The loan agreement provides for the recovery of attorney fees incurred by Bank "in taking possession of, disposing of, or preserving the collateral after any default." Bank argues that, although Boge was the prevailing party in the action, he did not prevail on any of the types of claims enumerated in the attorney fee provision. Instead, according to Bank, Boge prevailed on a different—and implied—term of the agreement, for which attorney fees are not provided.

■ We think that Bank's argument rests on too narrow a definition of Boge's claim. Although the breach was of the implied duty of good faith, the resulting damages flowed from Bank's possession and disposition of the collateral. The reciprocity principle of ORS 20.096 requires that Boge recover the attorney fees that he incurred in connection with those activities of Bank, for which it could have recovered fees if it had been the prevailing party. *See Flight Dynamics, Inc. v. Questech Capital Corp.,* 76 Or App 166, 708 P2d 1173 (1985), *rev den* 300 Or 563 (1986).

Affirmed.

---

[5] In his response to this assignment of error, Boge states that it is "completely frivolous" and that he is entitled to 10 percent damages under ORS 19.160. We deny his request. The appeal as a whole does not have the deficiencies required by ORS 19.160.